**SECURITIES AND EXCHANGE COMMISSION, Plaintiff-Appellant,**

v.

**ADVANCE GROWTH CAPITAL CORPORATION et al., Defendants-Appellees.**

No. 71–1817.

United States Court of Appeals,
Seventh Circuit.

Argued April 18, 1972.

Decided Nov. 13, 1972.

G. Bradford Cook, Walter P. North, Robert E. Kushner, Attys., Securities & Exchange Commission, Washington, D. C., John I. Mayer, S. & E. C., Chicago, Ill., for plaintiff-appellant.

Peter D. Giachini, Maywood, Ill., John Powers Crowley, Chicago, Ill., John J. Murphy, Maywood, Ill., for defendants-appellees.

Before DUFFY and MURRAH,* Senior Circuit Judges, and JUERGENS,** District Judge.

MURRAH, Senior Circuit Judge.

This action is brought by the Securities and Exchange Commission (Commission) pursuant to Sections 36 and 42(e) of the Investment Company Act of 1940, 15 U.S.C. § 80a–35 and 41(e), against Advance Growth Capital Corporation, Peter D. Giachini, Chairman of Advance Growth's Board of Directors, and John J. Murphy, the company's president and director.

The Investment Company Act is a comprehensive regulatory scheme designed to prevent abusive practices by those in control of investment companies. As the Act declares:

". . . the national public interest and the interest of investors are adversely affected—

". . .

"(2) when investment companies are organized, operated, managed, or their portfolio securities are selected, in the interest of directors, officers, investment advisors, depositors, or other affiliated persons thereof, . . . rather than in the interest of all classes of such companies' security holders . . . ."

Section 17 of the Act, thus, prohibits "affiliated persons,"[1] including officers

---

* Senior Circuit Judge Alfred P. Murrah of the Tenth Circuit is sitting by designation.

** Chief District Judge William G. Juergens of the Eastern District of Illinois is sitting by designation.

1. An affiliated person is defined in Section 2(a)(3) of the Investment Company Act as follows:

"'Affiliated person' of another person means (A) any person directly or indirectly owning, controlling, or holding with power to vote, 5 per centum or

and directors, from taking part in certain transactions unless they bear the burden of proving in advance that such transactions are reasonable, fair and consistent with the purposes of the Act. Sections 36 and 42(e) empower the appropriate district courts, on petition of the Commission, to utilize traditional equity jurisdiction as a ready means of enforcing general compliance with the provisions of the Act.

The Commission's complaint in this case alleges generally that Sections 17(a), 17(d), 34(b) and 36 of the Act [2]

have been violated as a result of certain transactions between Advance Growth and various affiliated persons of either Advance Growth or defendant Giachini, and because of a failure to disclose information regarding certain affiliated persons in annual reports submitted to the Commission. On the basis of these alleged violations the Commission sought: (1) to enjoin permanently Giachini and Murphy from violating the Investment Company Act and from serving as officers and/or directors of Advance Growth or any other regulated investment com-

more of the outstanding voting securities of such other person; (B) any person 5 per centum or more of whose outstanding voting securities are directly or indirectly owned, controlled, or held with power to vote, by such other person; (C) any person directly or indirectly controlling, controlled by, or under common control with, such other person; (D) any officer, director, partner, copartner, or employee of such other person . . . ." 15 U.S.C. § 80a-2(a)(3).

Section 2(a)(28) defines "person" as a natural person or a company. 15 U.S.C. § 80a-2(a)(28).

2. Section 17(a) of the Investment Company Act, 15 U.S.C. § 80a-17(a), seeks to protect investment companies and their shareholders against overreaching or self-dealing by officers, directors, and other affiliated persons. Insofar as relevant, the section provides that it is unlawful for any affiliated person of an investment company or any affiliated person of such a person, acting as principal —(1) knowingly to sell property to, or (2) knowingly to purchase property from, or (3) to borrow money or other property from, the investment company or any company controlled by such investment company.

Under Section 17(b) of the Act, 15 U.S.C. § 80a-17(b), any person may file with the Commission an application for an order exempting a proposed transaction of the applicant from the provisions of Section 17(a). The Commission shall grant the exemption if evidence establishes, among other things, that the terms of the transaction are fair and reasonable, do not involve overreaching on the part of any person concerned, and are consistent with the general purposes of the Act.

Section 17(d) of the Act, 15 U.S.C. § 80a-17(d), like Section 17(a), seeks to protect investment companies and their shareholders from overreaching and self-dealing by affiliated persons, and there is great textual similarity in the language of the two sections. Insofar as relevant, Section 17(d) provides in conjunction with Rule 17d-1, that it is unlawful for any affiliated person of an investment company or any affiliated person of such a person, acting as principal, to effect any transaction in which the investment company or a company controlled by it is a joint or joint and several participant with such person or affiliated person, unless an application for exemption has been previously filed and granted by the Commission.

Rule 17d-1, 17 C.F.R. 270.17d-1, provides that in passing upon such applications the Commission is to consider whether the investment company's participation in the transaction is consistent with the purposes of the Act, and the extent to which such participation is on a basis different from or less advantageous than that of other participants.

Section 34(b), 15 U.S.C. § 80a-33(b), among other things, makes it unlawful for any person to make an untrue statement in a report or omit to state material facts necessary in order to prevent the statements made from being materially misleading.

Section 36 of the Act, 15 U.S.C. § 80a-35, was amended subsequent to the trial of this case. As applicable herein, it authorizes the Commission to seek injunctive relief removing from office officers and directors of investment companies who have engaged in gross abuse of trust or gross misconduct with respect to the investment company for which such person serves or acts.

pany; and, (2) the appointment of a receiver to conduct the affairs of Advance Growth.

Some 19 months after the conclusion of a lengthy trial, the District Court entered Findings of Fact and Conclusions of Law and a memorandum opinion. The essence of the decision was that while violations of Sections 17(a) and 17(d) of the Investment Company Act had occurred, they were inadvertent in nature and not disadvantageous to Advance Growth; the Commission's requests for a permanent injunction and appointment of a receiver were, therefore, denied. The court did enter an order, which expired March 31, 1972, directing the defendants to conform more strictly to the statute and to obtain the consent of the Commission before making any loan which might entail a conflict between the interests of Advance Growth and that of any of its officers, directors, or shareholders. The Commission appeals, claiming that the equitable remedies sought should have been granted on the basis of the violations clearly established at trial and recognized by the trial court's findings. We are in partial agreement with the Commission's arguments and reverse the trial court's order to that extent.

The basic facts are these. Advance Growth Capital is a small business investment company licensed by the Small Business Administration (S.B.A.) and registered with the Commission pursuant to the Investment Company Act, 15 U.S.C. § 80a–8. It has outstanding approximately 439,000 shares of common stock held by some 1,100 stockholders. Upon its organization in 1961, Advance Growth raised approximately $6,500,000 in capital by obtaining a loan from the S.B.A. and selling its stock to the public. It made several improvident investments with these funds resulting in large losses. As a consequence of these losses and some especially high operating expenses —consisting primarily of management salaries, benefits, and expense account items—the company soon found itself in the red.

Defendant Giachini, a practicing attorney and owner of a substantial amount of Advance Growth stock, was disturbed by the company's losses, which he justly considered to be the product of flagrant mismanagement. Because of this concern with management practices, Giachini formed a group of stockholders, including his law partner Murphy, for purposes of gaining control of the affairs of Advance Growth. Upon realization of this goal in 1963, Giachini and Murphy were named, respectively, as chairman of the board and president/director of the company.

The new management began its program to rejuvenate Advance Growth by eliminating directors' fees and officers' salaries and benefits. They also moved the offices from Chicago into less expensive quarters in the suburb of Maywood, Illinois.[3] All of the company's staff and office expenses were absorbed by the new officers' law firm. Giachini and Murphy also expended a great deal of time and effort traveling about the country attempting to salvage as much as possible from the unprofitable loans made by prior management. As a result of the dramatic cuts in operating expenses, coupled with a somewhat fluctuating increase in income since Giachini and Murphy gained control, Advance Growth has gradually reduced its large deficit and achieved some degree of financial stability—especially in comparison with its condition under prior management. On the basis of these facts the trial court found that from the time they assumed office Giachini and Murphy worked arduously and without com-

---

3. The law firm of Giachini and Murphy shares its offices with Advance Growth. Also sharing the same offices are G. L. Service Corporation, Continental Mortgage Corporation, and Hardy Realty Company. Immediately adjacent to these offices is the Maywood-Proviso State Bank. All of these business enterprises are controlled by Giachini and are affiliated persons within the meaning of the Investment Company Act (see note 1 supra).

pensation to restore Advance Growth to a solvent and viable status.

Despite these efforts, the company's capital was severely impaired in 1965, and the S.B.A. filed suit seeking apointment of a receiver in dissolution. This impairment was subsequently cured by the sale of certain assets, and the S.B.A. suit was dismissed in 1966. Shortly thereafter, however, the Securities and Exchange Commission began an investigation of Advance Growth because of certain allegedly improper transactions with affiliated companies. That investigation culminated in the present action.

The tangled web of affiliations and the many transactions resulting in the alleged violations are involved and complex. Because of our inherent disagreement with the trial court's characterization and appraisal of the defendants' conduct, we find it necessary to treat the facts in some detail, not only for background purposes but also to indicate our own assessment of those facts which we find to be operative and controlling.

*The Addison Industrial Land Transactions*

In 1965, Giachini played the dominant role in forming Proviso Industrial Builders. Advance Growth owns 49% of Proviso's stock; the remaining 51% is owned by Mario Roselli and Mal Monbrod, experienced builders and real estate developers doing business as Roselli-Monbrod Builders. Proviso, as a controlled company of Advance Growth, is an affiliated person within the meaning of the Act. At the urging of Giachini,

Proviso purchased a one-third interest in 45 acres of land in Addison, Illinois. The other two-thirds interest was owned by Hardy Realty Company, also an affiliated person of Advance Growth.[4] Proviso and Hardy formed Addison Industrial Land, a partnership devoted to development of the 45 acre tract for use as industrial plant sites. Actual development of the tract was carried out by Roselli and Monbrod. As compensation for these services they received a share of Proviso's profits by virtue of their 51% ownership interest. Hardy, although owner of two-thirds of the tract, bore none of the responsibility for developing or selling the Addison land and paid nothing for the services of Roselli and Monbrod.

Several lots in the tract contained peat deposits, making them unsuitable for construction purposes without extensive modifications. The lots containing peat were purchased from Addison by Proviso, and buildings were constructed on most of them by either Proviso or Roselli-Monbrod. These purchases were made pursuant to an understanding, arranged by Giachini, which obligated Proviso to purchase all lots with substantial peat deposits.[5] Roselli-Monbrod Builders purchased 18 lots from the Addison partnership. Only one of these lots contained any peat deposits, and it was needed for use as a parking lot adjacent to one of Roselli-Monbrod's completed buildings. Hardy Realty received $264,000 in cash from Addison Industrial's sale of lots. Proviso's share was $132,000, but it used $112,500 of this

---

4. Giachini effectively controlled 79% of the stock in Hardy Realty. He owned 47% of the stock in his own name and controlled 32% owned by Continental Mortgage Corporation.

5. The trial court found that "the only persuasive evidence" as to whether Proviso "was compelled to purchase lots with a peat condition . . . was the testimony of Mr. Roselli . . . . He testified that he was the judge of all the land that was selected, and that he picked only the best." The record indicates, however, that Roselli did not tes-

tify at trial. The unsworn statements relied upon as testimony by the trial court were made at a hearing more than a year after the trial's conclusion. Moreover, a significant amount of uncontroverted trial testimony by Giachini and Monbrod unequivocally indicates that all parties to the transaction understood that Proviso would purchase the lots with peat deposits, and that this understanding was arranged by Giachini. The trial court's findings and conclusions, insofar as they are contrary to this evidence, must be deemed clearly erroneous.

**46**

amount to purchase lots from the partnership—mostly the undesirable peat lots.

Approximately a year after trial, Proviso sought the District Court's approval to sell its interest in the remaining Addison lots to Hardy Realty for the sum of $50,000. The court approved the sale, although the Commission objected to it claiming a lack of evidence that the price offered was fair.

In 1967, at Giachini's direction, Proviso made a $125,000 loan to Roselli-Monbrod Builders at 6½% interest per annum. The loan was used to repay a loan owed by Roselli-Monbrod to the Maywood-Proviso State Bank—another affiliated person under the Act [6]—the bank's loan having been classified as substandard by bank examiners. Roselli-Monbrod repaid the Advance Growth loan one year later, after the Commission notified Giachini that the transaction was in violation of the Investment Company Act.

■ On the basis of these facts the Commission claims: (1) that Giachini caused Proviso to enter into the Addison Industrial partnership with an affiliated person of Giachini (Hardy) without having sought or received Commission approval as required by Section 17(d) of the Act and Rule 17d–1 thereunder; (2) that as part of this joint enterprise, Proviso and Roselli-Monbrod [7] purchased lots from the partnership without having sought and received Commission approval as required by Sections 17(a) and 17(b) of the Act; (3) that Proviso loaned funds to Roselli-Monbrod without having sought or received Commission approval as required by Sections 17(a) and 17(b); and (4) that Giachini grossly abused the trust he owed Advance Growth by permitting Proviso to participate in the Addison partnership on a less advantageous basis than that enjoyed by Hardy Realty, which he controlled.

The trial court found that development of the tract was a joint transaction within Section 17(d), and that Proviso had purchased lots from Addison Industrial. It concluded, however, that "S.E.C. rules were not knowingly violated," and that "failure to obtain prior written approval was inadvertent and not willful." The court also concluded that "Proviso . . . was not treated on a basis different from or less advantageous than Hardy . . .," and stated that the loan from Proviso to Roselli-Monbrod ". . . was not disadvantageous to Proviso Industrial Builders."

■ With all respect we are compelled to disagree with the trial court's appraisal of the defendants' conduct. It is difficult to account for the conclusion that Proviso was not treated less advantageously or on a different basis when the evidence clearly reveals that Giachini arranged for Proviso to purchase all of the undesirable peat lots and pay for all of Roselli-Monbrod's services, whereas its partner, Hardy Realty, purchased none of the peat lots and paid nothing for the developers' services.[8]

6. Giachini is a director and president of the bank. Murphy is also a director and its vice-president. 50% of the bank's shares are owned by Continental Mortgage Corporation which Giachini controls.

7. Since Proviso as a controlled company of Advance Growth is an affiliated person of the investment company, Roselli-Monbrod Builders, as owner of 51% of Proviso's stock, is an affiliated person of an affiliated person of Advance Growth and could not purchase property from a partnership in which a controlled company of Advance Growth—Proviso—held a one-third interest without requesting and receiving an exemption from the Commission pursuant to Section 17(b) of the Act.

8. The defendants argue that it was understood by all parties that the purchase price of the peat lots was to be adjusted in Proviso's favor at a later date to account for any expenses required in order to make the lots saleable. Even if such an agreement does exist, there is no evidence that any adjustments have been made, and the unfair treatment accord-

Moreover, correspondence and communications between the defendants and the Commission reveal that the defendants were aware of the provisions of the Act and had been warned that certain transactions violated those provisions well before they embarked upon the Addison Industrial Land venture.[9] If these defendants, both practicing attorneys, were not substantially aware of the Act's provisions after communications and repeated warnings from the Commission, it was because they assumed an ostrich-like stance for which directors and officers of regulated investment companies cannot be excused. In these circumstances we do not think the violations of the Act resulting from the Addison Land transactions can be properly characterized as "unknowing," "inadvertent," or "unwilling."

ed Proviso continues unabated. The necessity for such an agreement, moreover, substantiates the Commission's claim that Proviso was treated on a different basis or less advantageously.

9. For example, as early as 1965, the Commission informed Murphy that a sale of Advance Growth's office furniture to Continental Mortgage would " . . . be in violation of Section 17(a) of the Act in the absence of an order of exemption from the Commission issued upon application by the investment company pursuant to Section 17(b)."

Later that same year, Giachini proposed a transaction involving the issuance of preferred stock to Continental Mortgage and his wife. A member of the Commission's staff asked Gianchini to read Sections 17(a), 17(b), and 18 of the Act and to decide for himself whether such a transaction was prohibited. Giachini replied by letter:

"I read Sections 17A and 17B of the Investment Act of 1940, and it appears to me that the Act excludes our transaction. The Act further indicates that the S.E.C. has authority upon application to exempt other companies from all or part of the Act where the S.E.C. finds such action is necessary or appropriate in the public interest and consistent with the protection of investors.

"We would like to make application at this time for exemption if such exemption is necessary.

### Transactions with G. L. Service Corporation

When Giachini and Murphy took control of Advance Growth they automatically became the principal officers of Intermediates, Inc. One of the most serious problems confronting them was a loan which the prior management had made to Intermediates. The loan of $775,000 was of no value. Because of a large tax loss possessed by Intermediates, Giachini wanted the company to engage in profitable activities so that it could earn money on a tax-free basis and, thereby, repay its obligation to Advance Growth. He decided that the purchase of real estate tax certificates would be a highly profitable investment and entered into an agreement to have a large number of these purchased in the names of Intermediates, Inc. and G. L.

*      *      *      *      *

"You have recommended that we hire counsel familiar with S.E.C. practices and procedures. If necessary we will do so."

Giachini was later informed that this letter did not meet the formal requirements for an application for exemption, and he agreed not to issue any securities until a formal application had been filed with the Commission and granted.

In 1968, Giachini stated in another letter to the Commission:

"Thank you for calling to our attention the fact that one of our portfolio companies, Proviso Industrial Builders, erred in making a loan to one of its shareholders, Roselli-Monbrod Builders Corp.

"On November 14, 1968, Continental Mortgage Corporation made a loan of $125,000 to Roselli-Monbrod Builders Corp. and Roselli-Monbrod Builders Corp. paid its loan to Proviso Industrial Builders in full."

One day prior to writing this letter, Giachini had Proviso purchase lots from the Addison Industrial Land partnership in which Hardy Realty, a Giachini owned and controlled company, had a two-thirds partnership interest. That same week Giachini wrote another letter to the Commission in which he admitted: "Because of our many affiliated companies, we recognize that almost everything we do is a violation . . . ."

Service Corporation, an affiliated person of Advance Growth.[10]

In January, 1966, Giachini felt that the tax certificate venture would be particularly profitable. He accordingly asked the G. L. board of directors to consent to the sale of their tax certificates to Intermediates at G. L.'s cost so that Intermediates could realize the profits rather than G. L. Intermediates paid G. L. $78,000 for its share of the tax certificates.

Advance Growth was later advised by the S.B.A. that the tax certificate venture was not considered a proper investment for a small business investment company. To comply with S.B.A. regulations, Intermediates sold to G. L. all of its tax certificates—those which it originally owned as well as those purchased from G. L. G. L. paid for these certificates by giving its promissory note for $310,186.95 to Advance Growth.[11] The amount of the note reflected the cost of the certificates, $298,964.15, plus 4% add-on interest. Giachini testified that he determined the amount of the note and fixed the rate of interest for the first year at 4%, because he deemed that rate "proper and fair." The note stated that it was due November 30, 1967, one year from its date, but also provided for interest at 7% per annum if continued after that date. None of the principal had been paid when the note fell due. Two years after the note's effective date G. L. had paid only

$35,000, and a new note for $275,000, at 7% interest, was executed due October 1, 1969. Unlike the previous note which assigned the tax certificates as collateral, the new note was unsecured. This new note was also unpaid when due. A balance of $170,000 remaining unpaid at the time of trial, was finally paid by G. L. in March, 1971, approximately 14 months after conclusion of the trial and over four years after the date of the original note.

The Commission contends that these transactions constitute violations of Section 17(a) of the Act that were particularly disadvantageous to Advance Growth and its portfolio company, Intermediates. In support of this contention, the Commission points out: (1) although Giachini testified that he knew from personal observation that the tax certificates were worth twice their actual cost, he used that cost in fixing the price to be paid for the tax certificates by G. L.;[12] (2) during the period G. L. was paying Advance Growth 4% and 7% interest on the unpaid balance of its note, Giachini was quoting "the flat-rate of 14½% on all new loans for Advance Growth;" (3) during a period when the tax certificates produced cash receipts of over $217,000 to G. L., only $90,000 was paid on the principal of the note; and, (4) during the same period that its note to Advance Growth was overdue, G. L. loaned more than $150,000 to Hardy Realty and Continental Mortgage.[13]

10. G. L. Service, a mortgage and loan company, was organized by, Giachini and he places investments, arranges financing, and acts as counsel for it. 20% of the G. L. Service common stock is owned or controlled by Giachini's family. Two additional directors of Advance Growth each own 5% of G. L. Service stock. G. L. Service, in turn, has owned 6.27% of Advance Growth's common stock since December, 1966.

11. The giving of G. L. Service's note to Advance Growth, rather than Intermediates, may be explained in this way. Advance Growth accepted the note as partial payment on two demand notes which it had received from Intermediates, Inc. in July, 1966. The amount of the G. L.

Service note together with cash receipts from the liquidation of all other Intermediates assets was enough to cover the principal of the two Intermediates notes, but it only covered a small amount of the interest due on them.

12. Testimony indicated that at the time of trial deeds obtained from the tax certificates had a fair market value of between $750,000 and $1,000,000.

13. Giachini is president and director of Continental Mortgage and owns 66% of its shares. Continental, in turn, owns 50% of the shares in Maywood-Proviso State Bank, 32% of the shares in Hardy Realty, and since February, 1968, has owned 5.31% of the shares in Advance Growth.

The trial court agreed with the Commission that Intermediates' sale of the tax certificates to G. L. required prior approval, but again found that failure to obtain such approval was not willful, but inadvertent, and did not constitute a *knowing* violation of Section 17(a) of the Act or any wrongdoing or over-reaching on the part of Giachini. It also concluded that the transaction was not disadvantageous to Advance Growth or its portfolio company, Intermediates, Inc.

The trial court found that various other transactions between Advance Growth and G. L. Service also constituted technical violations of the Act, although inadvertent and unknowing in character. With regard to two of these transactions it ordered G. L. to reimburse Advance Growth by paying it sums of $3,000 plus interest, and $1,479.21. The court determined that a separate transaction—G. L's purchase of an account receivable for $28,380 upon liquidation of Intermediates' assets—did not result in any loss to Advance Growth or Intermediates and that there was no over-reaching or wrongdoing involved.

Again, we cannot agree with the trial court's characterization and appraisal of these violations. For example, it seems highly improbable that the tax certificate transaction—whereby Advance Growth provided 100% financing for four years at low interest rates for G. L.'s purchase at cost of a portfolio company's highly profitable assets—was absolutely without disadvantage to either Advance Growth or Intermediates, Inc.

With regard to whether these violations were knowingly committed, it is significant that in 1966 an agreement whereby Advance Growth was to sell certain assets to G. L. Service was rescinded, at least partly because the Commission would not grant its approval. At this point Giachini and Murphy must have been alerted that Commission approval was necessary for transactions between Advance Growth and G. L., and yet all of the allegedly violative transactions between the two companies—including the tax certificate deal—were entered into at later dates.

### Subordination and Shelter Agreements

The Commission says that Advance Growth's loan and investment decisions concerning twelve companies in its investment portfolio were made in combination with five affiliated companies—Continental Mortgage, Hardy Realty, G. L. Service, Madison Management Company, and Welles-Roland Service Company [14]—without having sought or received an order of exemption from the Commission pursuant to Section 17(d) and Rule 17d–1. It also says that a sixth affiliated company, the Maywood-Proviso State Bank,[15] combined its loan and investment decisions with Advance Growth's without filing timely and detailed reports concerning such transactions with the Commission pursuant to Rule 17d–1(d).[16]

Advance Growth and various of these six affiliated companies often loaned

14. The affiliated status of Continental Mortgage, G. L. Service, and Hardy Realty has been explained, *supra*, at notes 4, 10 and 13. Madison Management, a finance company, is an affiliated person under the provisions of the Investment Company Act, because its president and director, Charles F. Southward, is also a director of Advance Growth. Southward is also president, director and 8% shareholder of Welles-Roland, a loan company. Giachini holds title to 9% of Welles-Roland stock *as collateral for a loan*.

15. Maywood-Proviso State Bank's status as an affiliated person under the provisions of the Investment Company Act was set forth *supra* at note 6.

16. Although Rule 17d–1(d), 17 C.F.R. § 270.17d–1(d), *exempts certain transactions* where a bank and an affiliated small business investment company invest funds in the same small business concern from the requirement of prior Commission approval, it requires timely and detailed reports of such transactions to be filed with the Commission.

funds to the same companies. For example, during the period from July, 1964, to October, 1969, Advance Growth loaned twelve of its portfolio companies approximately $3,000,000 in some 51 transactions (constituting approximately 75% of Advance Growth's total investments) while the six affiliated persons loaned the same twelve companies approximately $3,250,000 in some 229 transactions. Giachini had the controlling voice in all decisions by any of the various affiliates with regard to these loan transactions.

The Commission further charges that through these loan practices Giachini and Murphy abused the trust they owed Advance Growth within the meaning of Section 36 of the Act by causing the investment company: (1) to follow a "normal practice" of subordinating its secured position to that of the Maywood Bank; (2) in some instances to release its security for the benefit of an affiliated person without compensation; and (3) to serve as a shelter for the short-term financing of affiliated persons by allowing proceeds from its loans to be used in paying off loans which the borrower owed to an affiliate. The particulars of two of the loan transactions to which the Commission objects will serve to illustrate the general nature of these allegedly violative practices.

In 1966, Advance Growth loaned $200,000 to LRH Corporation, a newly formed construction company. In 1967, when the LRH debt amounted to approximately $195,000 and was two months in default,[17] Advance Growth (by Murphy) subordinated to the Maywood Bank its interest in the most valuable collateral it held as security for the LRH debt. By virtue of this subordination the bank acquired security for a prior loan to LRH of $25,000, as well as a second $25,000 loan made at the time of subordination. Advance Growth subsequently loaned

LRH an additional $165,500. All of the various loans to LRH (with total principal due of some $357,000) have long been in default, but, as a result of the subordination agreement, the bank's loan is obviously better secured.

In 1968, an official of Maywood Bank reviewed the total indebtedness of LRH and, in a memorandum to Giachini, noted the extremely perilous nature of all the loans. Four months after this review of the LRH situation, Giachini executed a release of Advance Growth's security interest in an LRH property, thereby allowing LRH to sell the property. LRH used the sale proceeds to pay off in full its $82,500 indebtedness to Continental Mortgage. As part of the sales price LRH also accepted a building which it had constructed in faulty fashion. Although LRH owed Advance Growth over $300,000 in delinquent loans, the investment company received nothing for its release of collateral and none of the sale proceeds; indeed, it even loaned an additional $30,500 to LRH less than a month later.

A second transaction of interest is Advance Growth's loans to Mike Di-Paolo, Inc. In June, 1966, Advance Growth loaned DiPaolo $137,500. Of this amount $31,800 was used to repay a loan made by Madison Management. While the Advance Growth loan was outstanding, DiPaolo obtained a loan from the Maywood Bank. In July, 1967, an official of the bank examined the DiPaolo loan and stated in a memorandum to Giachini that it was "expensive" and "rather hazardous." The loan, amounting to over $37,000, was classified as substandard by federal bank examiners, and a few months later the bank charged the loan off as a bad debt. In August, 1968, although DiPaolo was four months and $9,000 delinquent on its debt payments to Advance Growth, the investment company loaned DiPaolo an additional $50,000. These funds were

17. Additional evidence of LRH's extremely shaky financial position is provided by the fact that one month prior to the subordination Continental Mortgage made

what Giachini referred to as "an emergency," "a matter of life and death" loan to LRH in the amount of $20,750.

used to repay the full amount of the Maywood Bank loan ($37,700) and a $4,900 loan from Continental Mortgage.

With regard to transactions involving the Maywood Bank, the trial court determined that the subordination of Advance Growth's position to that of the bank was not a purchase or sale of a security or other property so as to come within the provisions of Section 17(a) of the Act; therefore, no exemption from the Commission was required. The court went on to conclude that reports of the transactions should have been filed with the Commission pursuant to Rule 17d–1(d),[18] but that the subordinations of interest were, in each instance, "normal commercial transactions in the ordinary course of business," that they were not disadvantageous to Advance Growth, and did not result in any personal gain to Giachini or Murphy. The court also concluded that subordination to Continental Mortgage of Advance Growth's security interest in the LRH collateral "was a normal business practice not subject to criticism," and did not constitute a violation of Section 17 of the Act.

Once more we find ourselves in disagreement with the trial court's rationalization of the violations in question. Instead, we agree with the Commission that Advance Growth and its controlled companies were harmed by the consistent subordination of their interest to those of the various affiliated companies, and that transactions of this type are indicative of conduct that tends to be overreaching. The disadvantageous nature of the shelter and subordination transactions seems manifest. Labels such as "normal business practice" and "normal commercial transaction" cannot be used to explain away the fact that Advance Growth invariably came out second best when involved in such transactions with any of the six affiliated companies. For example, it is signifi-

cant that as of October 1, 1969, Advance Growth, after providing twelve portfolio companies with over $900,000 to pay off short-term obligations to the various affiliated companies, had 58% of its loans to those companies outstanding, whereas only 19% of the affiliated companies' loans to those same portfolio companies was outstanding.

A review of the record indicates that these violations, like the others we have examined, cannot be described as unknowing or inadvertent. In 1968, during the investigation that led to this lawsuit, the Commission staff reviewed the provisions of Section 17(d) and Rule 17d–1 with Giachini. Only a few weeks later, Giachini had Advance Growth make the $50,000 loan to Mike DiPaolo, Inc. DiPaolo used these funds to pay off outstanding loans from various affiliated companies, including the $37,700 loan from the Maywood Bank which had been written off as uncollectible. A few months later Giachini also had Advance Growth release its interest in the LRH property without consideration so that $82,500 which LRH owed to Continental Mortgage could be paid in full.

### Materially False Statements and Omissions in Annual Reports

As a registered investment company Advance Growth is required to file annual reports with the Commission on Form N–5R. *See* Section 30(a) of the Act, 15 U.S.C. § 80a–29(a), and Rules 30a–1 and 30a–2 thereunder, 17 C.F.R. § 270.30a–1 and 30a–2. Section 34(b), 15 U.S.C. § 80a–33(b), of the Act, makes it unlawful for any person to make an untrue statement in that report or to omit material facts which are necessary in order to prevent the report from being materially misleading. Item 18 of Form N–5R is entitled, "Interests of Affiliated Persons in Certain Transactions," and requires detailed information con-

---

18. The court specifically stated that the transactions involving the Maywood Bank and Mike DiPaolo, Inc. were not joint transactions in contravention of Section 17(d) and the rules thereunder. Presumably, therefore, a report would not be required by Rule 17d–1(d) for this transaction.

cerning transactions between the investment company and its affiliated persons or affiliated persons of such persons. The four reports which Advance Growth filed for the annual periods ending March 31, 1965, through March 31, 1968, disclosed only two of the several affiliated transactions of which the Commission complains. The report for 1967 disclosed the tax certificate transaction as a G. L. Service purchase of "certain assets," "for $310,187." It failed, however, to disclose the form of payment or the nature of G. L. Service's relationship as an affiliated person, although the instructions applicable to Item 18 of Form N–5R specifically require the disclosure of this information. The 1967 report also disclosed G. L. Service's purchase of an account receivable from Intermediates, Inc. for $28,380; but, again, it failed to disclose the nature of G. L. Service's affiliated relationship.

These annual reports were prepared by the accounting firm of Ernst and Ernst—but not certified by them—and were signed by Murphy as president of Advance Growth. The Commission claims that Murphy, with full knowledge of the material facts in question, signed and caused to be filed false and misleading reports, and that he was knowingly aided and abetted in these actions by Giachini. The trial court found that ". . . Ernst and Ernst prepared the N–5R reports based upon their expertise, and then submitted them to the officers of Advance Growth for signature and transmittal. Any omissions from these reports were not caused by any willful action of the officers of Advance Growth, but were caused by the good faith and reliance of the officers upon the expertise of Ernst and Ernst after full disclosure of all material facts to Ernst and Ernst." The court concluded, moreover, that any misstatements in these reports ". . . were minor, inadvertent and made unknowingly."

We disagree. The omissions of material facts from the N–5R forms which Advance Growth filed with the Commission constituted violations of Section 34(b) of the Act, and the trial court's conclusion to the contrary must be deemed clearly erroneous. The fact that the defendants relied upon the expertise of an accounting firm which completed the forms cannot serve as an excuse for failing to meet Section 34(b)'s requirements. Officers and directors of investment companies should not be allowed to avoid their statutory duties so easily. To hold otherwise would make it impossible to enforce the disclosure provisions of the Act. *See* Capital Funds, Inc. v. Securities and Exchange Commission, 348 F.2d 582, 588–589 (8th Cir. 1965). The omissions are not required to be willful to be in violation of Section 34(b).[19]

Giachini cannot escape responsibility for the violations of Section 34(b) by virtue of the fact that Murphy alone signed the N–5R forms. Giachini had actual knowledge of the transactions which should have been disclosed, as well as the duty and authority to see that they were disclosed. By his silence and inaction Giachini aided and abetted the incomplete disclosures and, along with Murphy, was responsible for the violations of Section 34(b). *See* Buttrey v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 410 F.2d 135 (7th Cir. 1969), cert. denied, 396 U.S. 838, 90 S.Ct. 98, 24 L. Ed.2d 88; Brennan v. Midwestern United Life Insurance Company, 259 F.Supp. 673, 682 (N.D.Ind.1966), aff'd, 417 F.2d 147 (7th Cir. 1969), cert. denied, 397 U. S. 989, 90 S.Ct. 1122, 25 L.Ed.2d 397 (1970); Securities & Exchange Com'n v. North American R. & D. Corp., 424 F.2d 63, 81 (2d Cir. 1970); Securities & Exch. Com'n v. National Bankers Life Ins. Co., 334 F.Supp. 444, 456 (N.D. Tex.1971).

19. Compare the provisions of Section 34 (a), 15 U.S.C. § 80a–33(a), which require the acts prohibited therein to be performed "willfully" before a violation will occur.

## The Remedy

■ Section 42(e) of the Investment Company Act, 15 U.S.C. § 80a–41(e), which authorizes the injunctive relief the Commission seeks, is a classic example of modern utilization of traditional equity jurisdiction for the enforcement of a congressionally declared public policy administered by a regulatory agency established for that purpose. The equity jurisdiction granted in statutes such as this is traditional in nature, its essence being ". . . the power of the Chancellor to do equity and to mould each decree to the necessities of the particular case." Hecht Co. v. Bowles, 321 U.S. 321, 329, 64 S.Ct. 587, 592, 88 L.Ed. 754 (1944). But that power must also be exercised in harmony with the overall objectives of the legislative scheme, and courts should be alert to provide appropriate remedies for the effectuation of the declared national policy. Otherwise, that policy may be frustrated by judicial inaction. See Hecht Co. v. Bowles, *supra* at 331, 64 S.Ct. 587; Bowles v. Montgomery Ward & Co., 143 F.2d 38, 43 (7th Cir. 1944); Mitchell v. Pidcock, 299 F.2d 281, 287 (5th Cir. 1962); Securities and Exchange Commission v. Culpepper, 270 F.2d 241, 250 (2d Cir. 1959).

■ It is, then, the public interest enunciated in the legislation which serves as the criterion for the proper exercise of equity powers. And while trial courts should properly be accorded wide latitude in fashioning equitable remedies in cases of this type, it is the inescapable function of the appellate court to make sure that the fashioned remedy meets that criterion in accordance with the regulatory scheme and adequately serves the particularized needs of the case before the court. Although injunctive relief is never automatic upon the showing of a violation of the Act or regulations (*see* Hecht Co. v. Bowles, *supra*), we should not hesitate to reverse an order denying such relief when it is evident that the trial court's discretion

has not been exercised to effectuate the manifest objectives of the specific legislation involved. When the facts of this case are scrutinized in light of the remedial objectives of the Investment Company Act, we think the trial court's refusal to grant a permanent injunction against future violations is a clear abuse of discretion. In view of our basic disagreement, we find it necessary to refashion the remedies to make them more appropriate to the facts of the case as we see them.

Respectable authority justifies injunctive relief even though infractions are inadvertent and harmless, if they are likely to recur. See Securities & Exchange Commission v. Pearson, 426 F.2d 1339, 1343 (10th Cir. 1970); Securities and Exchange Commission v. Dott, 302 F.Supp. 169, 171 (S.D.N.Y.1969); Securities & Exchange Com'n v. Northeastern Financial Corp., 268 F.Supp. 412, 414 (D.C.N.J.1967); 3 Loss, Securities Regulation, pp. 1975–1979 (2d ed. 1961). Improper past conduct ". . . gives rise to the inference that there [is] a reasonable likelihood of future violations." Securities and Exchange Com'n v. Keller Corp., 323 F.2d 397, 402 (7th Cir. 1963). See also Tanzer v. Huffines, 287 F.Supp. 273, 275 (D.C.Del.1968), aff'd, 408 F.2d 42 (3d Cir. 1969). Securities & Exchange Com'n v. Northeastern Financial Corp., *supra*. This is true even though the illegal activities are discontinued either before or after commencement of a lawsuit. See Hecht Co. v. Bowles, *supra* 321 U.S. at 327, 64 S.Ct. 587; Securities and Exchange Commission v. Culpepper, *supra* 270 F.2d at 249.

As we have indicated, however, we are convinced that the defendants' violations were not inadvertent and harmless; rather, they were committed with knowledge of the Act's provisions and were clearly disadvantageous to Advance Growth and its shareholders. These were not mere "technical" violations of regulatory legislation, but continual and extensive violations of provisions which

lie at the very heart of a remedial statute. They provide the opportunity for personal gain by those with fiduciary obligations—the specific target of the Investment Company Act's prohibitions. *See* United States v. Deutsch, 451 F.2d 98, 108, 111 (2d Cir. 1971), cert. denied, 404 U.S. 1019, 92 S.Ct. 682, 30 L.Ed.2d 667 (1972). The record indicates that the violations of Section 17 by the defendants continued not only after° this lawsuit was commenced but until several months after the trial,[20] and that, at the very least, ". . . there exists some cognizable danger of recurrent violation. . . ." United States v. W. T. Grant Co., 345 U.S. 629, 633, 73 S.Ct. 894, 898, 97 L.Ed. 1303 (1953). In the circumstances as we find them, the defendants should have been permanently enjoined from further violations of the Act.

This leaves us with the question whether the actions of Giachini and Murphy constituted such gross misconduct or gross abuse of trust within the meaning of Section 36 of the Act, 15 U.S.C. § 80a–35(a), as to dictate their ouster and the appointment of a receiver. Based upon its observation of the defendants and appraisal of the evidence, the trial court found that, although certain acts of Giachini and Murphy were subject to criticism, they had also done many admirable things. On the basis of these findings the court concluded:

"It would be more than a disservice to Advance Growth, its stockholders and creditors, it would be a disaster to them for this court to appoint a Receiver or otherwise interfere with the conduct of the affairs of Advance Growth by the defendants Giachini, Murphy and their fellow directors after they rescued Advance Growth from bankruptcy in 1964, and saved it from dissolution in 1965 and 1966, and have since that time restored most of the capital that was dissipated in the 1962 binge of the officers and directors."

We cannot say that the trial court, acting with the benefit of first-hand observation of the trial proceedings, abused its discretion in reaching these conclusions. Weighing all the equities it is probable that removal of the defendants and appointment of a receiver would be more detrimental than beneficial to the investment company and its shareholders, and, as Section 36(a) expressly recognizes, the ultimate benefit of these parties is the primary objective of the Act. Equitable receiverships are drastic remedies which often fall short of their intended objectives. The purpose of injunctive relief is, after all, not to punish but to deter future violations, thus insuring general compliance with the broad remedial design of the legislation. *See* Hecht Co. v. Bowles, *supra*, 321 U.S. at 329, 64 S.Ct. 587. From our appellate point of view we certainly cannot say that the trial court's determination not to remove the defendants and appoint a receiver according to the pro-

20. For example, in July and August, 1969, several weeks after the complaint in this action had been filed and just prior to the trial court's appointment of a fiscal agent to oversee all transactions, Advance Growth made loans to the Flame companies (two restaurants which had obtained loans and financing from various of Giachini's companies since 1964), the proceeds of which were used to pay off loans of some $55,000 owed to Madison Management and Welles-Roland, both affiliated persons of affiliated persons of Advance Growth. Another example is the fact that Giachini testified repeatedly during the trial that it was his intention to have Proviso continue purchasing all peat lots in the Addison subdivision, even though this plan was the target of some of the Commission's most vociferous objections. Indeed, the first indication that Proviso's role in the development of the Addison tract was to be abandoned came some five months after the trial. It is also significant that G. L. Service did not pay off its promissory note to Advance Growth until some 14 months after trial. And, finally, we note that the few rectifications of Section 17 violations which have been made did not come voluntarily, but were required by the trial court's order.

visions of Section 36 of the Investment Company Act, 15 U.S.C. § 80a–35(a), was manifestly incorrect.[21] Whether the defendants are barred under the provisions of § 9(a)(2) of the Investment Company Act, 15 U.S.C. § 80a–9(a)(2), from serving in their present capacity or any other capacity with Advance Growth absent exemption under § 9(c) of the Act, 15 U.S.C. § 80a–9(c), is an administrative matter within the provisions of the Commission as to which we express no opinion beyond what has already been said in connection with eligibility under Section 36.

It is significant, we think, that as the case comes to us for review the defendants have continued to manage Advance Growth's affairs—until recently, under the injunctive guidance of the court. There will be time enough to scrutinize their conduct during this period in light of the injunctive supervision granted by the trial court and refashioned here. It may well be that in the interim the defendants have managed the affairs of Advance Growth so as to rectify their past conduct and to give reasonable assurance of future compliance with the Act. In any event, equity jurisdiction continues to be available for whatever remedy may be appropriate under present or future circumstances.

The trial court's order is vacated in part and remanded for entry of an order permanently enjoining the defendants from violating any of the Act's provisions.

21. Since the commencement of this case Section 36 has been amended to authorize the Commission to bring an action for injunctive relief based on allegations that designated persons have engaged in, or are about to engage in, "any act or practice constituting a breach of fiduciary duty involving personal misconduct in respect of any registered investment company." *See* 15 U.S.C. § 80a–35(a). We are aware, moreover, that the provisions of the Act impose fiduciary obligations of the highest order upon persons who control investment companies. *See* Rosenfeld v. Black, 445 F.2d 1337, 1342–1344 (2d Cir. 1971), cert. pending; Aldred

Inv. Trust v. Securities and Exchange Com'n, 151 F.2d 254, 260 (1st Cir. 1945), cert. denied, 326 U.S. 795, 66 S.Ct. 486, 90 L.Ed. 483 (1946); Brown v. Bullock, 194 F.Supp. 207, 238 (S.D.N.Y.1961), aff'd on other grounds, 294 F.2d 415 (2d Cir.). It is unnecessary, however, for us to decide what our ultimate decision would have been if the trial court's discretion had been exercised in light of the standard erected in the amended Section 36.