**SECURITIES AND EXCHANGE COMMISSION, Plaintiff,**

v.

**PIMCO ADVISORS FUND MANAGEMENT LLC, Pea Capital LLC f/k/a Pimco Equity Advisors LLC, Pimco Advisors Distributors LLC, Stephen J. Treadway, and Kenneth W. Corba, Defendants.**

No. 04 Civ. 3464(VM).

United States District Court, S.D. New York.

Oct. 22, 2004.

Nicolas Morgan, Adam Schneir, U.S. Securities and Exchange Commission, Los Angeles, CA, for plaintiff.

Alan Levine, Kronish Lieb Weiner & Hellman, L.L.P., Richard Mark Strassberg, Goodwin Procter LLP, New York City, for defendants.

### DECISION AND ORDER

MARRERO, District Judge.

Defendants Stephen J. Treadway ("Treadway") and Kenneth W. Corba ("Corba") have each moved to dismiss the Complaint filed against them by the Securities and Exchange Commission ("SEC") in this action. For the reasons discussed below, the Court denies Treadway's motion in its entirety, and denies Corba's motions to dismiss all claims except for those alleging primary violations of Section 10(b) of the Exchange Act and Section 34(b) of the Investment Company Act. Corba's motion to dismiss these two claims are granted without prejudice.

### I. BACKGROUND[1]

#### A. THE SEC'S ALLEGATIONS

Treadway and Corba were, until their recent resignations, executives with several corporate entities within the PIMCO family of mutual funds, PIMCO Advisors Fund Management LLC ("PAFM"), PIMCO Advisors Distributors LLC ("PAD"), and PEA Capital LLC ("PEA") (collectively, the "PIMCO Entities"). Treadway was the CEO of PAFM and PAD, as well as the Chairman of the Board of Trustees for the PIMCO Funds: Multimanager Series ("PIMCO Funds"). Corba was CEO of PEA, which acted as an advisor to the PIMCO Funds, as well as manager of two of the PIMCO funds, the PIMCO Growth Fund and the PIMCO Select Growth Fund, that played a role in the scheme alleged by the Complaint.

The SEC brought the instant enforcement action by reason of an alleged arrangement that Treadway and Corba entered into, on behalf of several of the PIMCO Entities, with Canary Capital Partners LLC ("Canary"), a firm that specialized in a practice known as "market timing" during the period at issue. Mutual fund market timing is a form of arbitrage activity that takes advantage of small short-term fluctuations in mutual fund prices. In order for a market timing firm to achieve substantial gains using the strategy, it must be able to quickly cycle its investments into and out of the targeted funds, engaging in what are known in the industry as "round trips."

While market timing can be a successful strategy for individual investors and is not itself illegal, it can also harm investors in a mutual fund that permits market timing by increasing trading and brokerage costs, as well as tax liabilities, incurred by a fund and spread across all fund investors. The quick pace of investments and redemptions associated with market timing may also hinder the ability of mutual fund managers to act in the best interests of fund investors who seek to maximize their long-term investment gains. It would make little sense for a fund manager to invest in assets with significant long-term potential but high short-term volatility if a market timer's redemptions could force the quick sale of fund assets. *See, e.g., First Lincoln Holdings, Inc. v. Equitable Life Assurance Soc'y*, 164 F.Supp.2d 383, 390–94 (S.D.N.Y. 2001) (discussing the detrimental effects of market timing on long-term mutual fund investors); Alan R. Bromberg and Lewis D. Lowenfels, 6 *Bromberg & Lowenfels on Securities Fraud and Commodities Fraud* §§ 16.1–12 (2d Ed.2004) (hereinafter, "*Bromberg & Lowenfels*") (describing the use and abuse of market timing and a related practice, late trading in mutual funds, within the mutual fund industry);

---

1. In a motion to dismiss the Court must accept as true all factual allegations made in the complaint. *DGM Invs., Inc. v. N.Y. Futures Exch., Inc.*, 265 F.Supp.2d 254, 259 (S.D.N.Y. 2003). Accordingly, the following summary of allegations is derived principally from the SEC's May 5, 2004 Complaint (hereinafter, "Compl.").

Compl. ¶ 46 (alleging that market timing caused PIMCO funds to incur "(1) increased trading and brokerage costs; (2) disruption of portfolio management activities; and .(3) additional capital gains that increased shareholders' tax liabilities").

The potential for market timing to harm the interests of mutual fund investors has led many mutual funds, including the PIMCO Funds, to adopt policies intended to limit market timing within their funds. According to the Complaint, PAD, on behalf of the PIMCO. Funds, froze hundreds of accounts, sent warning letters to dozens of registered representatives, and took other measures intended to curb or eliminate the use of market timing in PIMCO mutual funds. The Complaint alleges that Treadway himself was responsible for curbing market timing within the PIMCO funds through his role as CEO of PAD and his supervision of PAD's "timing police." (*Compl.* ¶ 24.)

PIMCO, through its public communications to investors, made clear that it intended to minimize market timing activities within the PIMCO funds. According to the Complaint, the prospectuses published by the PIMCO Funds in November 2001 and February 2002 contained the following disclosure concerning market timing:

> The Trust reserves the right to refuse exchange purchases, if, in the judgment of PIMCO Advisors, the purchase would adversely affect a Fund and its shareholders. In particular, a pattern of exchanges characteristic of "market-timing" strategies may be deemed by PIMCO Advisors to be detrimental to the Trust or a particular Fund. Currently, the Trust limits the number of "round trip" exchanges an investor may make.... The Trust has the right to refuse any exchange for any investor who completes (by making the exchange back into the shares of the originally

purchased Fund) more than six round trip exchanges in any twelve-month period. Although the Trust has no current intention of terminating or modifying the exchange privilege other than as set forth in the preceding sentence, it reserves the right to do so at any time. (*Id.* ¶ 39.) Similar language was contained in all fund prospectuses issued between November 2001 and 2003, and other publications, including shareholders' guides and Statements of Additional Information accompanying prospectuses, contained warnings against market timing.

The SEC alleges that Treadway's and Corba' actions with respect to Canary contrasted sharply with the market timing policies articulated in the PIMCO Funds' public disclosures and implemented by the PIMCO timing police. Specifically, Treadway and Corba personally negotiated an arrangement with Canary allowing Canary to engage in market timing activities within certain PIMCO funds. The negotiations began in late 2001 when broker representatives contacted Corba on Canary's behalf, and concluded in January 2002, when Treadway personally approved the arrangement. The original arrangement granted Canary up to $100 million in market timing capacity in the PIMCO Growth, Target, and Innovation Funds to be exchanged in up to four round trips per month, provided that Canary's holdings could not exceed more than three percent of any fund's assets. In exchange, Canary agreed to place "sticky assets," *i.e.,* long-term investments, equal to twenty-five percent of the amount of timing capacity it used into a fourth PIMCO Fund, the PIMCO Select Growth Fund. Thus, under the proposed arrangement, investors in one fund, the Select Growth Fund, would obtain a significant benefit, while investors in the Growth, Target, and Innovation Funds would bear all of the costs of Canary's market timing activities.

According to the SEC, Canary's actual market timing practices varied somewhat from the terms of the original arrangement. The portfolio manager of the Innovation Fund forbade Canary from market timing within that fund after Canary had engaged in a first round-trip exchange using the fund. Canary found ways around this limitation on its market timing activities, in part by investing $2 million in a hedge fund managed by the PIMCO Entities, the PIMCO Equity Advisors Horizon Fund LP (the "Horizon Fund"), in exchange for receiving $5 million in market timing capacity in yet another PIMCO Fund, the Opportunity Fund. Canary also allegedly engaged in extremely aggressive market timing using the Growth and Target Funds, executing over twenty-eight round-trip exchanges in the Growth Fund, with a dollar volume of at least $1.8 billion, during a six-month period in 2002, and in over forty round-trip exchanges in the Target Fund, with a dollar value of over $2 billion, during a ten-month period in 2002. According to the SEC, Canary also benefitted from disclosure by PEA of nonpublic information concerning the portfolio holdings of several PIMCO funds. With this nonpublic "inside information," Canary was able to anticipate the daily changes in price of the funds that it market timed with a great deal of precision and essentially guarantee the success of market timing trades. *See Bromberg & Lowenfels* § 16.9 (discussing market timers' widespread illegal practices of obtaining inside information on fund composition in furtherance of their schemes).

The SEC asserts that while Canary's aggressive market timing practices quickly drew Treadway and Corba's attention, both failed to act quickly to stop them. Corba was informed as early as March of 2002 that Canary's practices were disruptive to several PIMCO funds, and Corba, Treadway, and others received e-mails in April of 2002 from PAD's timing police

indicating that Canary's market timing practices were exceeding agreed-upon limits and causing significant trade settlement problems. In May of 2002, Corba sent an e-mail characterizing Canary's trading as "the most opportunistic but extreme form of market timing [he had] ever seen." (Compl.¶ 53.) Despite their early recognition that Canary's practices were harmful to PIMCO investors, Treadway and Corba failed to take concrete steps to stop the timing practices until late 2002, and allowed Canary to continue market timing in PIMCO Funds until as late as May 2003. (*Id.* ¶¶ 56–57.)

The SEC also alleges that Treadway and Corba consistently failed to disclose Canary's disruptive market timing practices to the Board of Trustees of the PIMCO Funds or, more importantly for purposes of assessing the merits of Treadway's and Corba's motions, to investors in the funds affected by Canary's market timing practices. While Corba informed the board of PEA of the Canary arrangement, he did not take steps to ensure that the public disclosures accompanying the funds that PEA or he personally managed reflected the arrangement. Treadway, according to the SEC, did not disclose the market timing arrangement to the PIMCO Funds' Board of Trustees until September of 2003, even though he had discussed market timing-related issues with the Board several times beginning in 2002. Nor did Treadway, as a signatory of the PIMCO Funds' disclosures to shareholders, ever make efforts to modify market timing-related disclosures to reflect the existence of the Canary arrangement.

The Court notes that the SEC's allegations in this case are by no means unusual. According to the SEC investigations, press reports, allegations in complaints, and expert commentary, many mutual fund com-

panies engaged in huge volumes of undisclosed transactions with Canary and other market timers during the period at issue. Mutual fund companies have paid several hundred million dollars in fines to the SEC and state regulators, and have disgorged millions more in fees and profits to investors harmed by market timing practices, since the New York State Attorney General filed the first enforcement action against Canary in late 2003. *See, e.g., Bromberg & Lowenfels* § 16.1 (discussing the genesis of the mutual fund market timing and late trading scandal); In re Invesco Funds Group, AIM Advisors, Inc., and AIM Distributors, Inc., Investment Company Act Release No. 26,629 (Oct. 8, 2004) (announcing settlements of market timing-related enforcement actions with Invesco Funds Group ("IFG") and AIM in which IFG agreed to pay $215 million in disgorgement and $110 million in civil penalties, and AIM agreed to pay $20 million in disgorgement and $20 million in civil penalties); *In re Janus Mutual Funds Investment Lit.*, 310 F.Supp.2d 1359 (J.P.M.L.2004) (consolidating dozens of private suits brought against Canary and several families of mutual funds based on undisclosed market timing and late trading practices).[2] The SEC's discovery of the mutual fund industry's systemic failure to adequately disclose market timing arrangements or prevent selective disclosure of mutual fund portfolio holdings to "favored" market timers has

led the agency to implement a new rule specifically prohibiting selective disclosure of portfolio holdings. This Rule mandates that any side arrangements of the type allegedly entered into between the PIMCO Entities and Canary be disclosed, and requires that any policies and procedures related to market timing also be shared with the public. *See* Final Market Timing Rule, 69 Fed.Reg. at 22,300.

## B. *PROCEEDINGS IN THIS CASE*

The SEC filed suit against Treadway, Corba, and the PIMCO Entities on May 5, 2004, alleging the scheme described above, accusing the parties of violating various provisions of the federal securities laws, and seeking disgorgement of profits, payment of monetary penalties, and imposition of several equitable remedies. In order to settle claims made by the instant suit, the PIMCO Entities agreed on September 13, 2004 to entry of an SEC order mandating payment of a $40 million fine and $10 million in disgorgement, and imposing several changes in PIMCO's governance structure intended to prevent recurrence of the alleged scheme. *See* In the Matter of PA Fund Management LLC, Investment Company Act Release No. 26,594 (Sept. 13, 2004). While the PIMCO Entities did not admit or deny the allegations contained in the Complaint, they did agree to cooperate fully with the SEC in all

---

**2.** For a selection of SEC publications and public announcements concerning other market timing enforcement actions brought by state and federal officials against mutual fund companies, *see, e.g.,* In re Massachusetts Financial Services Co., Investment Company Act Release No. 26,347 (Feb. 5, 2004) (announcing that Massachusetts Financial Services Co. ("MFS") would agree to pay $175 million in disgorgement and $50 million in penalties related in part to its misleading disclosures concerning market timing); Press Release, Office of the New York State Attorney General, *Alliance Agreement Includes New*

*Form of Relief for Shareholders* (Dec. 18, 2003) (announcing a $600 million settlement intended to penalize Alliance Capital for authorizing undisclosed market timing of its mutual funds); Disclosure Regarding Market Timing and Selective Disclosure of Portfolio Holdings, 69 Fed.Reg. 22,300 (Apr. 23, 2004) (to be codified at 17 C.F.R. pts. 239 and 274) (hereinafter, "Final Market Timing Rule") (discussing, as background to final rule imposing new mandatory disclosures regarding market timing on mutual fund companies, enforcement actions brought by the SEC related to market timing).

investigations, litigations, or other proceedings related to the alleged market timing scheme, *see id.* at 2, 13–14. In exchange for the PIMCO Entities' settlement of the charges levied against them, the SEC agreed to dismiss them from the instant action with prejudice, though it has not yet done so. *See* Press Release, SEC, *PIMCO Equity Mutual Funds' Adviser, Sub–Adviser, and Distributor Agree to Pay $50 Million to Settle Fraud Charges for Undisclosed Market Timing,* No.2004–127 (Sept. 13, 2004) (noting the SEC's intent to dismiss the PIMCO Entities from the instant suit).

The SEC has, however, continued to press forward with its claims against Treadway and Corba. The Complaint alleges that the two former PIMCO executives have personally violated Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a), Section 10(b) of the Exchange Act and Rule 10b–5 thereunder, 15 U.S.C. § 78j(b) & 17 C.F.R. § 240.10b–5, and Sections 34(b) and 36(a) of the Investment Company Act, 15 U.S.C. § 80a–33(b), and have aided and abetted PAFM and PEA's violations of Sections 206(1) and 206(2) of the Advisers Act, 15 U.S.C. §§ 80b–6(1) & 80b–6(2), and Rule 10b–5. The SEC seeks to enjoin Treadway and Corba from committing future violations of each of the charged statutes, permanently enjoin them from working for "any registered investment company as an officer, director, member of any advisory board, investment adviser, depositor, or principal underwriter" (Compl. at 24–25), and to impose monetary fines and disgorgement penalties upon them.

Treadway and Corba have each filed separate motions to dismiss the SEC's claims against them in their entirety. Each argues that the Complaint fails to state fraud claims against him personally with the particularity required by Federal Rule of Civil Procedure 9(b), and that the Complaint fails to allege that each had the necessary scienter to be charged with the primary and aiding and abetting violations listed above. Treadway's brief also argues that the PIMCO Funds' disclosures were not misleading, that even if they were, the misrepresentations or omissions were not material, and that other allegations are inadequate as a matter of law in various respects. Corba's brief incorporates Treadway's legal arguments, but also separately asserts that Corba's role with the PIMCO Entities was such that he could not, as a matter of law, be charged with the alleged misleading statements issued by the PIMCO Funds or be found liable for violation of Section 36(a) of the Investment Company Act. The Court now turns to evaluating each of these arguments for dismissal.

## II. *DISCUSSION*

### A. *THE SEC ALLEGES FRAUD WITH SUFFICIENT PARTICULARITY*

Federal Rule of Civil Procedure 9(b) requires that "in all averments of fraud or mistake, the circumstances constituting the fraud or mistake shall be stated with particularity." Fed.R.Civ.P. 9(b). "Malice, intent, knowledge and other conditions of mind of a person may be averred generally," *id.,* but a plaintiff must allege facts that give rise to a strong inference of fraudulent intent. *See Shields v. Citytrust Bancorp, Inc.,* 25 F.3d 1124, 1128 (2d Cir. 1994). The requirements of Rule 9(b) apply to allegations of securities fraud such as the ones made by the SEC against Treadway and Corba. *See Ganino v. Citizens Utils. Co.,* 228 F.3d 154, 168 (2d Cir. 2000). To comply with the requirements of Rule 9(b), an allegation of fraud must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain

why the statements were fraudulent." *Rombach v. Chang*, 355 F.3d 164, 170 (2d Cir.2004) (quoting *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1175 (2d Cir. 1993)).

■ The Court concludes that the SEC's Complaint meets the heightened pleading standards of Rule 9(b). The Complaint makes clear that the allegedly fraudulent statements included disclosures regarding market timing made by the PIMCO Funds and the PIMCO Entities bearing the signature of Treadway and with the alleged knowledge and assistance of Corba, as well as misleading statements and conduct by Treadway and Corba designed to hide the existence of the market timing arrangement from the public. While that the alleged market timing arrangement could not itself be *per se* fraudulent, as the SEC seems to suggest (*see* Plaintiff's Opposition to Defendants' Motion to Dismiss, dated Aug. 30, 2004 (hereinafter, "SEC Opp'n"), at 9 (stating that the fraudulent conduct consisted of "negotiating and/or approving the market timing arrangement with Canary")), the Complaint itself and other sections within the SEC's opposition brief place proper focus on the disjunction between disclosures allegedly issued or facilitated by Treadway and Corba, on the one hand, and Treadway and Corba's secretive relationship with Canary, on the other.

The Complaint references Treadway's allegedly fraudulent conduct on numerous occasions. First, the PIMCO Entities' relationship with Canary, which Treadway personally approved, was inconsistent with the market timing disclosures provided to the public. If the inconsistency amounts to a fraud, then Treadway's personal signature of the disclosures establishes by itself that fraud is being alleged with particularity against Treadway. Second, the Complaint alleges that Treadway defrauded the Board of Trustees of the PIMCO Funds by failing to disclose to them the existence of the Canary relationship. The Complaint charges Corba with fraud through a more indirect route, but still makes clear that it is seeking to pin the allegedly fraudulent disclosures on Corba and to contrast the disclosures with a Canary relationship that Corba allegedly took the lead in negotiating and managing. If Corba can, as a matter of law, be charged with making or aiding and abetting the misleading disclosures, then the connection between him and the allegedly fraudulent conduct is clear and complete.

## B. EVALUATION OF DEFENDANTS' 12(B)(6) MOTIONS

When considering a motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6) for failure to state a claim upon which relief can be granted, the Court must accept as true all well-pleaded factual allegations in the complaint and draw all reasonable inferences in favor of the non-moving party. *See Securities Investor Protection Corp. v. BDO Seidman, LLP*, 222 F.3d 63, 68 (2d Cir.2000). The Court may grant a motion to dismiss under Rule 12(b)(6) only if "it appears beyond doubt that the plaintiffs can prove no set of facts in support of his claim which would entitle him to relief." *Krimstock v. Kelly*, 306 F.3d 40, 48 (2d Cir.2002) (internal citations omitted).

### 1. 10b–5 Claims

#### (a) Treadway and Corba's Liability for Material Misrepresentations and Omissions

■ To state a cause of action under Section 10(b) of the Exchange Act and Rule 10b–5 thereunder, the SEC must prove that defendants "(1) made a material misrepresentation or a material omission as to which he had a duty to speak, or used a fraudulent device; (2) with scienter; (3) in connection with the purchase or sale of

securities." *SEC v. Monarch Funding Corp.*, 192 F.3d 295, 308 (2d Cir.1999). A statement or omission will be considered material if there is a substantial likelihood that a reasonable investor would consider it important in making an investment decision. *Basic Inc. v. Levinson,* 485 U.S. 224, 231–32, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988). Under Second Circuit precedent, "a complaint may not properly be dismissed pursuant to Rule 12(b)(6) ... on the ground that the alleged misstatements or omissions are not material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." *Goldman v. Belden,* 754 F.2d 1059, 1067 (2d Cir.1985).

■ Here, the SEC alleges that the PIMCO Funds made several disclosures concerning market timing that could be characterized as either material misrepresentations or material omissions. The disclosures could constitute misrepresentations because they gave the clear impression to investors that the PIMCO Funds were hostile to market timing activities and intended for use by long-term investors at the same time that PIMCO was negotiating and maintaining a market timing relationship with Canary.

Treadway's and Corba's arguments that the disclosures alleged by the SEC are not misrepresentations because the disclosures do not formally prohibit market timing under all circumstances miss the mark. Rule 10b–5 makes it unlawful to "make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, *in the light of the circumstances under which they were made,* not misleading." Rule 10b–5(b), 17 C.F.R. § 240.10b–5(b) (emphasis added). In this case, at the same time that PIMCO assured investors that it would act to stop market timing activities if they were deemed "detrimental to the

Trust or a particular Fund," and that the company "limit[ed] the number of 'round trip' exchanges an investor may make" (Compl.¶ 39), PIMCO was negotiating a preferred market timing arrangement with Canary that, according to the Complaint, harmed several of the PIMCO Funds *with the knowledge* of Treadway and Corba, and that did not apply the same market timing limits to Canary that applied to all other PIMCO Funds investors. Thus, even if the Canary arrangement was not strictly prohibited by the alleged disclosures, the disclosures were clearly misleading *under the circumstances* because they informed investors that the management of the PIMCO Funds would act to protect the interests of long-term investors from market timers at the same time that the Funds were, under the direction of Treadway and Corba, allegedly facilitating an undisclosed market timing arrangement. The alleged misstatements were material; given the multi-billion dollar scale of Canary's trading volume under the market timing agreement, and the alleged admissions by Treadway and Corba that Canary's activities were disruptive to several of the PIMCO Funds, the Court cannot conclude that the alleged misrepresentations are "so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." *Goldman,* 754 F.2d at 1067. Because the disclosures here could easily be read by a factfinder to strictly limit market timing, and because the Canary arrangement was so out of keeping with the PIMCO Funds' policy against market timing, dismissal of the SEC's misrepresentation claim is inappropriate at this stage of the proceedings.

The failure to disclose the underlying market timing arrangement with Canary could similarly be considered a material omission. Disclosure of the arrangement, with its potential detrimental impact on

investors in several mutual funds affected by the market timing practices, could easily have affected a reasonable long-term investor's decision to invest in one of the funds that Canary aggressively market-timed. The Court concludes that failure to disclose the arrangement, which was negotiated and implemented at the same time that the PIMCO Funds issued a blanket statement indicating its hostility to market timing practices, may give rise to liability under Rule 10b–5. *Cf. P. Stolz Family Partnership L.P. v. Daum*, 355 F.3d 92, 97 (2d Cir.2004) ("It would be perverse indeed if an offeror could knowingly misrepresent historical facts but at the same time disclaim those misrepresented facts with cautionary language.").

■ Treadway cannot avoid liability for the content of PIMCO Funds' disclosures stating a policy against market timing, since he himself was Chairman of the Board of the PIMCO Funds and, according to the Complaint, personally signed the misleading disclosures. Treadway nonetheless attempts to avoid liability for the misleading statements by arguing that the SEC has failed to allege his scienter with respect to the misleading nature of the disclosures. (*See* Defendant Stephen J. Treadway's Brief in Support of his Motion to Dismiss Plaintiff Securities and Exchange Commission's Complaint, dated Aug. 9, 2004 (hereinafter, "Treadway Br."), at 14–17.) According to Treadway, the Complaint fails to allege that he had "(i) both a motive and an opportunity to commit fraud," or allege facts that "constitute strong circumstantial evidence of conscious misbehavior or recklessness." (*Id.* at 14 (quoting *Chill v. General Electric Co.*, 101 F.3d 263, 267 (2d Cir.1996)).) He argues that he was unaware of Canary's placement of "sticky assets" in certain PIMCO Funds in exchange for the provision of market timing capacity, or that he intended to act inconsistently with the disclosed

market timing policy when he approved the Canary arrangement. (*Id.*)

The Court concludes that the Complaint does in fact contain numerous allegations constituting the necessary "strong circumstantial evidence of conscious misbehavior or recklessness," at least with respect to the misleading nature of the disclosures. Treadway was not only a signer of the misleading disclosures, but also, as CEO of PAD, personally responsible for the PIMCO Funds' timing police. From these circumstances, a reasonable factfinder could conclude that Treadway had to have been aware of the Funds' stated policies against market timing and orientation towards long-term investors at the time he allegedly personally approved the agreement with Canary authorizing Canary to engage in activities inconsistent with the Funds' disclosed market timing policies. (*See* Compl. ¶ 22–23 (indicating that Canary's proposed "market timing relationship," described as the provision of timing capacity in exchange for the placement of sticky assets in the Select Growth Fund, was described to and approved by Treadway).) Furthermore, Treadway's alleged statements and course of conduct strongly indicate that he was regularly made aware of the harmful nature of Canary's trading activities, but that he nonetheless failed to either disclose the activities or put a stop to them for more than a year after the conduct began. (*Id.* ¶¶ 55–57 (indicating that Treadway and Corba regularly discussed the Canary relationship and that Treadway allowed Canary's market timing to continue for several months after he was aware of its impact on the PIMCO Funds).) The Complaint also alleges that Treadway did not reveal the Canary arrangement to the Board of Trustees of the PIMCO Funds until September of 2003, which a factfinder could conclude indicated Treadway's awareness of the impropriety of his activities. Thus, the Court deter-

mines that the SEC has adequately pled Treadway's scienter with respect to Rule 10b–5 prohibition's of material misrepresentations or omissions.

■ The Court concludes that while Corba cannot be charged with primary liability for the material misrepresentations or omissions, he can be charged, at least by the SEC, with aiding and abetting liability for the misleading disclosures. The Second Circuit has clearly stated that "a defendant must actually make a false or misleading statement in order to be held [primarily] liable under Section 10(b). Anything short of such conduct is merely aiding and abetting, and no matter how substantial that aid may be, it is not enough to trigger [primary] liability under Section 10(b)." *Wright v. Ernst & Young LLP,* 152 F.3d 169, 175 (2d Cir.1998) (quoting *Shapiro v. Cantor,* 123 F.3d 717, 720 (2d Cir.1997)).

While the *Wright* decision appears to be in tension with later cases such as *In re Scholastic Corp. Sec. Litig.,* 252 F.3d 63 (2d Cir.2001), and *SEC v. U.S. Environmental, Inc.,* 155 F.3d 107 (2d Cir.1998), the Complaint as currently drafted fails to allege facts that would allow Corba to be charged with primary 10b–5 liability under either of the theories articulated in those cases. *See In re Global Crossing, Ltd. Securities Litigation,* 322 F.Supp.2d 319, 331 (S.D.N.Y.2004) (interpreting *Wright* in light of *Scholastic* and *U.S. Environmental* and noting tensions among the cases). *Scholastic* concluded that a company executive could be charged with primary liability for misleading disclosures even though the operative complaint in that case did not attribute specific misleading disclosures to him because the complaint alleged "on information and belief" that he personally disseminated misleading statements, was "primarily responsible for Scholastic's communications with investors and industry analysts," and "was involved in the drafting, producing, reviewing and/or disseminating of the false and misleading statements issued by Scholastic...." *Scholastic,* 252 F.3d at 75–76. As the *Global Crossing* court recognized, however, "While *Scholastic* might indicate some relaxation of *Wright's* requirement, ... it does not provide any guidance as to when a statement not attributed to a defendant might cross the line into a primary violation." *Global Crossing,* 322 F.Supp.2d at 331.

In *U.S. Environmental,* discussed in greater detail *infra,* the Second Circuit concluded that an individual who facilitated a fraudulent market manipulation with knowledge of the activity's fraudulence could be charged with a primary violation of Rule 10b–5 as someone who "participated in [a] fraudulent scheme or other activity proscribed by the securities laws." *U.S. Environmental,* 155 F.3d at 111 (citations and quotation marks omitted). But that case did not have occasion to interpret the interaction between it and *Wright,* since it dealt with an individual's liability for outright market manipulation rather than misleading statements at least formally made by another person or entity.

The Court acknowledges that there may be circumstances under which a mutual fund executive such as Corba could be charged with primary liability for false or misleading statements formally made by another under the rationales of *Scholastic* or *U.S. Environmental.* But the SEC's Complaint in this case does not assert facts necessary for such liability to attach for several reasons. First, while the operative complaint in *Scholastic* actually alleged on information and belief that the defendant had personally made misleading statements, the Complaint in this case does not contain any such allegations concerning Corba. Second, the defendant in *Scholastic* was alleged to have been pri-

marily responsible for communications with investors, and to have personally drafted many of the misleading communications alleged with specificity in the complaint, strongly supporting allegations that the defendant had in fact been personally and primarily responsible for issuance of misleading communications; Corba cannot be similarly charged because the Complaint fails to assert that he had primary responsibility for development or communication of any of the misleading statements. Third, the Complaint does not support the logical inference that Corba had personally drafted the misleading disclosures attributed to the PIMCO Funds, since the disclosures were issued by PAFM and covered all funds within the PIMCO Funds: Multi–Manager Series, not just those funds managed by PEA or Corba personally. While, as discussed below, Corba may be charged with aider and abettor liability on these facts for substantially assisting in the issuance of misleading disclosures by failing to correct statements he knew or should have known were misleading, the Court concludes that it would overstep the limitations imposed by *Wright* to charge Corba with primary liability for statements the Complaint does not allege he personally drafted or communicated to others.

The Court also declines to apply *U.S. Environmental* where the only allegations at issue relate to publication of material misrepresentations or omissions, and where *Wright* would otherwise bar a finding of primary 10b–5 liability. *U.S. Environmental'*s rule providing for primary liability where a defendant "participated in [a] fraudulent scheme or other activity proscribed by the securities laws," 155 F.3d at 111, may be applicable where, as in that case, the fraudulent activity involved *some* conduct other than participation in a scheme to make "a material misrepresentation or a material omission as to which he had a duty to speak," *Monarch Fund-*

*ing Corp.,* 192 F.3d at 308. But if *U.S. Environmental* were read to allow primary liability to attach to individuals who did no more than facilitate preparation of material representations or omissions actually communicated by others, then it would swallow *Wright'*s bright-line test altogether by allowing entities such as the auditors in *Wright,* who allegedly approved the issuance of misleading statements issued by others while knowing that they were misleading, to be charged with primary liability for participation in a "fraudulent scheme" to issue the misleading statements. *U.S. Environmental* did not indicate that it was overruling *Wright,* and the Court declines to find that it did so by implication.

 This does not end the Court's analysis of Corba's exposure to 10b–5 liability, however. While the Supreme Court has abolished private causes of action for aiding and abetting liability under Rule 10b–5, *see Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.,* 511 U.S. 164, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994), the SEC still may bring civil enforcement actions against those who aid and abet violations of federal securities laws, including Section 10(b) of the Securities Act and Rule 10b–5 thereunder. *See* 15 U.S.C. § 78t(e) (authorizing the SEC to seek injunctive relief and money damages against those who aid and abet violations of federal securities laws); *SEC v. Lybrand,* 200 F.Supp.2d 384, 398 (S.D.N.Y. 2002) (explaining that Congress passed 15 U.S.C. § 78t(e) to clarify that the SEC retained the authority to bring aiding and abetting actions after the *Central Bank* decision). Aiding and abetting liability consists of three elements: "(1) the existence of a securities law violation by the primary wrongdoer; (2) knowledge of the violation by the aider and abettor; and (3) proof that the aider and abettor substan-

tially assisted in the primary violation." *In re Laser Arms Corp. Sec. Litig.*, 794 F.Supp. 475, 491 (S.D.N.Y.1989) (citing *Armstrong v. McAlpin*, 699 F.2d 79, 91 (2d Cir.1983)). Recklessness is sufficient scienter to satisfy the knowledge element of aider and abettor liability in this case, where Corba, as an executive of the entity that managed investors' funds, owed a fiduciary duty to those who were defrauded by the misleading disclosures. *Armstrong*, 699 F.2d at 91.

The SEC has adequately pled each of the elements of Corba's aider and abettor liability for the PIMCO Entities' underlying 10b–5 violations. As discussed above, the SEC has alleged the existence of securities law violations by numerous primary wrongdoers, including Treadway, related to the material misrepresentations or omissions contained within the PIMCO Funds' disclosures. The SEC has satisfied the second element of aider and abettor liability by alleging that Corba was at least reckless in failing to ascertain whether the disclosures associated with the funds *he himself* managed, and the company that *he* led, were rendered misleading by the allegedly extreme and exceptionally harmful market timing activities undertaken pursuant to an undisclosed agreement that *he himself* negotiated with Canary on behalf of the PIMCO Entities. The Complaint's description of Corba's integral role in facilitating the alleged Canary relationship, and his positions of responsibility with respect to the funds affected by the relationship, create the "strong inference" that the misleading nature of the disclosures associated with the affected funds "was either known to [Corba] or so obvious that [Corba] must have been aware of it." *In re Laser Arms Corp. Sec. Litig.*, 794 F.Supp. 475, 491–92 (S.D.N.Y.1989). Corba's alleged facilitation of the undisclosed Canary arrangement and the market timing activities conducted thereunder, in combination with his failure to correct his own funds' market timing-related disclosures when they were rendered materially misleading, indicate that Corba provided substantial assistance in the primary violation and satisfy the third element of the "aiding and abetting" test. Thus, Corba's motion to dismiss the SEC's claim for aider and abettor liability under Rule 10b–5 is denied.

### (b) *Treadway and Corba Cannot be Held Primarily Liable for Use of a Fraudulent Device*

The SEC has also sought to charge Treadway and Corba with primary liability under Rule 10b–5 for use of a "fraudulent device" in connection with the sale of securities. (*See* SEC Opp'n Br. at 10 (quoting *SEC v. Monarch Funding Corp.*, 192 F.3d 295, 308 (2d Cir.1999)).) The SEC's apparent intent is to ensure that Corba may be held primarily liable for a 10b–5 violation, since Treadway clearly may be charged with the PIMCO Entities' material misrepresentations or omissions. The Court concludes, however, that the SEC has failed to allege the scienter necessary for Treadway or Corba to be charged with a separate violation of Rule 10b–5 under this theory of liability, and that the rule articulated in *Wright*, 152 F.3d at 169, thus continues to shield Corba from primary liability for violating rule 10b–5.

The Court reaches this conclusion for several reasons. First, the market timing agreement with Canary, standing alone, could not be considered *per se* a fraudulent device intended to defraud investors. The SEC does not allege, nor could it, that market timing practices are *per se* illegal, since many individual and institutional investors, as part of not uncommon investment strategies, continue to attempt to time markets with varying degrees of success. The Court notes that even the SEC's new final rule governing

market timing and selective disclosure of portfolio holdings would not appear to prohibit market timing arrangements of the type entered into between the PIMCO Funds and Canary; the rule simply requires that a mutual fund's policies, procedures, and practices concerning market timing be comprehensively disclosed. *See* Final Market Timing Rule, 60 Fed. Reg. at 22, 301–03. Arguably, the terms of the alleged Canary agreement, in which Canary received favorable treatment in exchange for its placement of long-term investments in various PIMCO Funds, violated the PIMCO Entities', and Treadway's and Corba's, fiduciary duties towards investors, but such potential violations do not by themselves result in violations of Rule 10b–5. *See Field v. Trump*, 850 F.2d 938, 947–48 (2d Cir. 1988) (allegations that a defendant violated his fiduciary duties towards investors do not themselves give rise to 10b–5 liability).

■ Second, while the indirect disclosure to Canary of nonpublic information regarding portfolio holdings for Canary's use in arbitrage activities may very well have constituted a "device, scheme, or artifice to defraud," Rule 10b–5(a), 17 C.F.R. § 240.10b–5(a), since selective disclosure for use by traders is itself illegal whether or not such practices are disclosed, there is no indication in the Complaint that the SEC seeks to charge Treadway or Corba with providing that nonpublic information to Canary, or even to allege that they knew such information was provided to Canary. *See* Final Market Timing Rule, 60 Fed.Reg. at 22,305–06 (noting the illegality of divulging nonpublic portfolio holdings to selected third parties for their use in trading); Compl. ¶¶ 58–59 (charging PEA, but not Treadway or Corba, with indirectly disclosing nonpublic holdings to Canary). If the SEC were able to charge Treadway or Corba with knowledge of the inherently fraudulent selective disclosures,

Treadway's and Corba's activities would fit squarely into the rule articulated in *U.S. Environmental*, 155 F.3d at 111, discussed above, in which "participat[ion] in a fraudulent scheme or other activity proscribed by the securities laws," 155 F.3d at 111, gives rise to primary 10b–5 liability. The Court agrees that the Complaint could be read to charge Treadway and Corba with facilitation of the entire Canary relationship, including its fraudulent elements. But the Complaint does not explicitly charge either individual defendant with sufficient knowledge of the allegedly fraudulent purpose of the overall scheme, *i.e.*, to give Canary a "sure bet" on funds it market timed by providing it a clear picture of how fund prices would move, to thereby give rise to 10b–5 liability for use of a fraudulent device in connection with the purchase or sale of securities.

### 2. *Section 17(a) Claims*

■ The SEC also charges Treadway and Corba with primary violations of Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a). To establish a violation of Section 17(a), the SEC must demonstrate essentially the same elements required by a claim under Exchange Act Section 10(b) and Rule 10b–5 thereunder, although "no showing of scienter is required for the SEC to obtain an injunction under subsections (a)(2) or (a)(3)" of Section 17(a). *Monarch*, 192 F.3d at 308. Section 17(a)(3) declares it unlawful "to engage in any transaction, practice, or course of business which operates or·would operate as a fraud or deceit upon the purchaser." 15 U.S.C. § 77q(a)(3).

■ The Court concludes that the SEC may obtain relief against both Treadway and Corba for primary violations of Section 17(a). Treadway may be found liable for the alleged material misrepresentations and omissions he personally issued on be-

half of the PIMCO Funds, as discussed above. Corba cannot be found primarily liable for the misrepresentations or omissions. The Court does find, however, that Corba's alleged acts on behalf of the Canary relationship facilitated the success of a fraud or deceit upon purchasers who were affected by the Canary market timing arrangement and PEA's illegal selective disclosure of portfolio holdings. While the SEC has failed to allege sufficient scienter to hold Corba primarily liable under Rule 10b–5 for his facilitation of the allegedly fraudulent scheme, proof of scienter is not necessary for Corba to be held liable under Section 17(a)(3) for his role in the scheme. Therefore, the SEC's Section 17(a) claims shall not be dismissed.

### 3. Section 206(1) and 206(2) Aiding and Abetting Claims

■ The SEC alleges that Treadway and Corba's conduct aided and abetted violations by PAFM and PEA of Sections 206(1) and 206(2) of the Investment Advisers Act (the "Advisers Act"); 15 U.S.C. §§ 80b–6(1) & 80b–6(2). The provisions of Sections 206(1) and 206(2) have been interpreted as substantively indistinguishable from Section 17(a) of the Securities Act, except that Section 206(1) requires proof of fraudulent intent, while Section 206(2) simply requires proof of negligence by the primary wrongdoer. See SEC v. Moran, 922 F.Supp. 867, 896–97 (S.D.N.Y.1996). The SEC may not charge Treadway and Corba with violations of Section 206(1) or 206(2) directly, since they are not themselves investment advisers covered by the statutory provisions. See 15 U.S.C. §§ 80b–6 (prohibiting conduct by "investment advisers"); Sullivan v. Chase Inv. Servs. of Boston, Inc., 434 F.Supp. 171, 184–85 (N.D.Cal.1977) (concluding that "individuals who are not investment advisors" as defined by the Advisers Act cannot be held primarily liable for a Section 206 violation). However, under the caselaw dis-

cussed above concerning Corba's Section 10b–5 aiding and abetting liability, both Treadway and Corba may be found liable for aiding and abetting securities fraud committed by PAFM and PEA if: (1) the two corporate entities are found to have committed securities fraud; (2) Treadway and Corba had knowledge of the advisers' fraudulent acts; and (3) the two individuals are found to have substantially assisted in the primary violations by PAFM and PEA. See In re Laser Arms Corp., 794 F.Supp. at 491.

The Court concludes that the allegations in the Complaint could support the conclusion that PAFM and PEA are liable for primary violations of Sections 206(1) and 206(2) of the Advisers Act. According to the Complaint, PAFM and PEA were the advisers to the PIMCO Funds whose disclosures were allegedly fraudulent. (Compl.¶ 4.) These allegedly fraudulent disclosures constituted an "artifice[ ] to defraud clients or prospective clients," Section 206(1), as well as a "practice[ ] or course[ ] of business ... which operated as a fraud or deceit upon clients or prospective clients," Section 206(2). Scienter of the corporate entities is ascertained through the mental state of its management, PAFM in the case of Treadway and PEA in the case of Corba. See SEC v. Manor Nursing Centers, Inc., 458 F.2d 1082, 1089 n. 3 (2d Cir.1972) (concluding that a corporation's mental state may be imputed from the mental state of its managers). For the reasons discussed above, the Court concludes that the SEC has adequately alleged Treadway and Corba's knowledge of the fraudulence of the disclosures and their substantial assistance in the alleged fraudulent communications with investors. Therefore, the Section 206 aiding and abetting claims against Treadway and Corba may not be dismissed.

#### 4. Section 34(b) Claims

The SEC charges Treadway and Corba with primary violations of Section 34(b) of the Investment Company Act; 15 U.S.C. § 80a–33, which prohibits material misrepresentations or omissions in terms similar to Section 10b–5. *See Saylor v. Lindsley*, 456 F.2d 896, 903 (2d Cir.1972) (noting that Section 34(b) tracks the language and interpretation of Section 10b–5). For the reasons discussed above, the Court denies Treadway's motion for dismissal of this claim, but grants Corba's motion for dismissal under the logic of *Wright*, 152 F.3d at 175. The SEC attempts to avoid *Wright* by charging Corba with, as a practical matter, "authority over [the] content" of the misleading statements (*see* SEC Opp'n Br. at 22–23), but the Complaint does not contain these allegations.[3] Thus, the Court concludes that Corba cannot be charged with primary liability for the PIMCO Entities' allegedly fraudulent disclosures pursuant to Section 34(b).

#### 5. Section 36(a) Claims

▇▇▇ Finally, the SEC charges Treadway and Corba with violations of Section 36(a) of the Investment Company Act, which prohibits "any act or practice constituting a breach of fiduciary duty involving personal misconduct in respect of any registered company for which [the defendant] serves or acts." 15 U.S.C. § 80a–35(a). In order to demonstrate a violation of Section 36(a), the SEC does not have to allege fraud or self-dealing; instead, it must demonstrate an accepted breach of fiduciary duty via affirmative acts or, in "in appropriate cases, nonfeasance of duty or abdication of responsibility." *Strougo v. Scudder, Stevens & Clark, Inc.*, 964 F.Supp. 783, 799 (S.D.N.Y.1997), *vacated in part on other grounds*, 282 F.3d 162 (2d Cir.2002) (internal citations and quotation markets omitted).

▇▇▇ Treadway seeks dismissal of the 36(a) claims by citing the higher standard of proof necessary for the SEC to prevail on its Section 36(a) claim, but this standard is not relevant for the purposes of the present motion. Nor is Treadway's attempt to construe the Complaint in a manner that does not charge him with full knowledge of the Canary relationship. As discussed above, the Complaint clearly alleges that Treadway was aware of the nature of the Canary arrangement, both at the time the arrangement was entered into and as the relationship developed. Finally, Treadway seeks to avoid liability by asserting what may be considered the "everyone was doing it" defense; since secret market timing arrangements were widespread in the industry, *see supra*, Treadway seems to suggest that he cannot be charged with violating his own fiduciary duties towards his investors. (Treadway Br. at 22–24.) The Court emphatically rejects this argument. If the conduct undertaken throughout the mutual fund industry was in gross violation of the industry's duties towards investors, as the hundreds of millions in fines and disgorgement paid to date seem to suggest, then

---

**3.** The Court also declines to hold that a separate and distinct standard exists for primary liability under Section 34(b) pursuant to language contained in *SEC v. Advanced Growth Capital Corp.*, 470 F.2d 40, 52 (7th Cir.1972) and quoted by the SEC in its opposition (*see* SEC Opp'n Br. at 23). *Advanced Growth Capital* held that a defendant could be held liable for a Section 34(b) violation in part because he "aided and abetted the incomplete disclosures" issued by another. *Id.* This opinion, from a sister Circuit, predated both *Central Bank's* clear distinction between primary and aider and abettor liability and *Wright's* rule concerning primary liability for misleading statements issued by another. Therefore, the Court concludes that it does not provide a definitive interpretation of the conditions under which primary liability for violation of Section 34(b) will attach.

Treadway cannot avoid liability simply by stating that he was one of many who did wrong, or that he is being unfairly singled out for punishment.

■■■ Corba seeks to avoid liability under Section 36(a) by claiming that he does not fall within the ambit of the section due to his limited role with the PIMCO Entities. But Section 36(a)(1) subjects anyone who serves "as officer, director, member of any advisory board, investment adviser, or depositor" to potential liability under the section. The Investment Company Act defines as an investment advisor "any person ... empowered to determine what securities ... shall be purchased and sold" by an investment company. 15 U.S.C. § 80a–2(a)(20). The Complaint clearly alleges that Corba could be considered an investment adviser covered by Section 36(a), both as CEO of PEA, a registered investment adviser to certain of the PIMCO Funds, or as portfolio manager for two of the mutual funds that were directly involved in the alleged market timing scheme. Therefore, Corba's motion to dismiss the Section 36(a) claim against him will also be denied.

### III. *ORDER*

For the reasons discussed above, it is hereby:

**ORDERED** that the motions of Defendant Kenneth Corba to dismiss the claims asserted against him for primary violations of Section 10(b) of the Exchange Act and Rule 10b–5 thereunder, and Section 34(b) of the Investment Company Act, are granted without prejudice; it is further

**ORDERED** that the motion of Defendants Stephen Treadway and Kenneth Corba to dismiss all other claims against them are hereby denied; it is further

**ORDERED** that the SEC may submit amended pleadings by November 10, 2004; and that it is finally

**ORDERED** that the parties confer and submit by November 15, 2004, for the Court's approval a proposed case management plan to govern the schedule of pretrial proceedings in this case.

**SO ORDERED.**